UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERIC POGUE,

     Plaintiff,                             Case No. 24-11134

v

OAKLAND UNIVERSITY,
and ASHLEY STONE, in her
official and individual capacity,

     Defendant.

_____

AKEEL & VALENTINE, PLC
Shereef H. Akeel (P54345)
Hasan Kaakarli (P81099)
Daniel W. Cermak (P84660)
888 W. Big Beaver Rd., Ste. 350
Troy, MI   48084
(248) 269-9595
shereef@akeelvalentine.com
hasan@akeelvalentine.com
daniel@akeelvalentine.com

*Attorneys for Plaintiff*

_____

## COMPLAINT AND JURY DEMAND

     **NOW COMES** Plaintiff, ERIC POGUE, by and through his undersigned counsel, AKEEL & VALENTINE, PLC, and for his Complaint against Defendants, OAKLAND UNIVERSITY and ASHLEY STONE, states as follows:

## INTRODUCTION

1.     Plaintiff, Eric Pogue, was the former coach of Defendant, Oakland University ("OU" or "Oakland").

2.     Plaintiff is one of the most accomplished and decorated Head Coach in OU's Men's Soccer ("OUMS") Team history.

3.     Coach Pogue won a League Championship nearly half of the seasons he was the Head Coach – seven out of his 15 seasons – and was selected Coach of the Year six times as the OUMS Head Coach.  This includes a League Championship and the honor of being Coach of the Year in 2023.

4.     Coach Pogue's accomplishments, especially during 2023 season, were significant because it demonstrated Coach Pogue was not just qualified to do his job, but was the best at his job in 2023 out of all the Head Coaches in the National Collegiate Athletic Association ("NCAA") Division 1 Horizon League, during a time when he was dealing with the debilitating disability of depression.

5.     Because of Coach Pogue's disability, and his efforts to speak out about the challenges of mental illness which had a significant stigma especially in male athletics, Defendant terminated his contract as the Head Coach of OUMS.

6.     Plaintiff thus brings this civil rights action pursuant to federal and state law, including the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et. seq.*; the Rehabilitation Act, 29 U.S.C. § 701 *et. seq.*; the Persons with Disabilities Civil Rights Act ("PWDCRA"), MCL § 37.1101 *et. seq.*; and the First Amendment

to the United States Constitution through 42 U.S.C. § 1983 to remedy discrimination based on a disability of a public employee, to remedy unconstitutional violations of their rights to freedom of speech in public employment, and to ensure that public employees are free to speak their views and be an employee with a disability and without fear of reprisals.

## JURISDICTIONAL ALLEGATIONS

7.    Plaintiff, Eric Pogue, is a resident of the State of Michigan.

8.    Defendant, Oakland University, is a public entity created under the Constitution of the State of Michigan and located in Oakland County, Michigan.

9.    Defendant, Ashley Stone, is being sued in her individual and official capacities, is Defendant OU's Senior Associate Athletic Director for Student-Athlete Excellence and Strategic Initiatives, and was Plaintiff's supervisor beginning in or around May 2019 until the date he was terminated.

10.    The actions that give rise to the claims asserted occurred in Oakland County, within the State of Michigan.

11.    This Honorable Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 as the claims asserted arise out of federal constitutional and statutory law, namely, 42 U.S.C. § 12101 *et. seq.*, 42 U.S.C. § 1983, and U.S. Const. Amend. I, XIV.

12.     This Honorable Court also has supplemental jurisdiction over Plaintiff's claims under Michigan laws pursuant to 28 U.S.C. § 1367(a) because they are inextricably intertwined with the federal claims and arise out of the same nucleus of operative facts.

13.     Venue is proper in this Honorable Court as Defendants conduct business within the Eastern District of Michigan, are subject to personal jurisdiction within the Eastern District of Michigan, and a substantial part of the events giving rise to the claims alleged occurred in the Eastern District of Michigan. *See* 28 U.S.C. § 1391(b).

14.     Plaintiff exhausted his administrative remedies.  On April 22, 2024, Plaintiff received a Right to Sue letter.

## FACTUAL ALLEGATIONS

15.     Plaintiff repeats and re-alleges the foregoing paragraphs, as though fully set forth herein.

**A. Coach Pogue's Amateur and Professional Soccer Career, Including at the Highest-Level Soccer League in the United States.**

16.     Coach Pogue was born in 1976.

17.     Coach Pogue has spent most of his life on a soccer field.

18.     Coach Pogue was a standout soccer player at Athens High School in Troy, Michigan.  **Exh. A** – OU Profile.

19.     Coach Pogue then joined OU's soccer team as a redshirt, before playing four years at Western Michigan University ("WMU").  **Exh. A** – OU Profile.

20.     Coach Pogue started all four seasons for the WMU Broncos and was named team captain and earned Most Valuable Player honors for his final three seasons.  **Exh. A** – OU Profile.

21.     During that time, or around 1996, Coach Pogue also played for the United Soccer League ("USL") Premier Development League ("PDL") with the Detroit Dynamite until 1998.  **Exh. A** – OU Profile.

22.     In 1998, Coach Pogue played for the Michigan Bucks until 2000, and later again in 2002.  **Exh. A** – OU Profile.

23.     Coach Pogue continued his goalkeeping career in the PDL for two seasons with the Toledo Slayers (2003-2004), with the Chicago Fire Premier (2005), and later the Kalamazoo Kingdon/TKO for two seasons.  **Exh. A** – OU Profile.

24.     Coach Pogue earned the All-PDL Goalkeeper award for five seasons.  **Exh. A** – OU Profile.

25.     In 2001, Coach Pogue was drafted in the fifth-round of the Major League Soccer ("MLS") Super Draft by the New England Revolution.  **Exh. A** – OU Profile.

26.     Coach Pogue also played for the Dallas Burn of the MLS.  **Exh. A** – OU Profile.

27.     Coach Pogue also later played for the Connecticut Wolves (in the USL A-League).

28.     Coach Pogue did not allow his playing career to interfere with his education.

29.     In 2000, Coach Pogue graduated from WMU with a bachelor's degree in finance and accounting.  **Exh. A** – OU Profile.

30.     Coach Pogue would later return to Oakland and earn his Master of Business Administration in 2006.  **Exh. A** – OU Profile.

**B. Coach Pogue Begins his Coaching Career and Surpasses the Success of his Playing Career.**

31.     Coach Pogue was always destined to be a coach, and began crafting his coaching skills as early as 1994.  **Exh. A** – OU Profile.

32.     In 1994, Coach Pogue worked as a goalkeeper trainer with area high schools, the Troy Premier Soccer Association, TKO Soccer Club of Portage/Kalamazoo, Bloomfield Hills Soccer Club, and the Michigan Bucks.  **Exh. A** – OU Profile.

33.     In 2001, Coach Pogue became a coach for the highly regarded Vardar Soccer Club, developing boys and girls ages 11-18 in a competitive youth soccer league.

34.     Coach Pogue later served as an assistant coach to the USSF Development Academy Vardar team that won a National Championship.

35.    As an assistant coach for Vardar, he won an under 18 US Developmental Academy National Championship in 2010.  **Exh. A** – OU Profile.

36.    Between 2005-2009, Coach Pogue served on the US Region II Regional Olympic Development Program ("ODP") staff and was a Michigan State ODP staff member.  **Exh. A** – OU Profile.

37.    Coach Pogue holds a United States Soccer Federation ("USSF") "B" coaching license and received his USSF National Goalkeeper license in 2009.  **Exh. A** – OU Profile.

38.    Coach Pogue has served as either a camp director or coach at the Detroit County Day Academy, Midwest Soccer Camps, Michigan Bucks Soccer School, Western Michigan, Oakland, and Detroit Rockers Soccer Camp.  **Exh. A** – OU Profile.

**C. Coach Pogue's Success as a Coach at OU is Unprecedented.**

39.    Defendants here are keenly aware of Coach Pogue's success at OU. **Exh. A** – OU Profile.

40.    In 2002, Coach Pogue became the Associate Head Coach for OUMS.

41.    During his eight seasons as the Associate Head Coach for OUMS – from 2002 to 2009 under Head Coach Gary Parsons – Coach Pogue compiled a record of 68-49-17.

42.    The team clinched four NCAA Tournament berths (2002, 2007, 2003, and 2008), five Summit League Championships (2002-2003, 2005, 2007-2008), and two Summit League Tournament Championships (2002 and 2007).

43.    From 2002-2023, Coach Pogue also founded and led a developmental summer soccer camp at OU, instilling goodwill on behalf of OU into thousands of future soccer players and students.

44.    In 2009, Coach Pogue was hired as the OUMS Head Coach.

45.    In his 15 seasons (2009-2023) as the OUMS Head Coach, Coach Pogue won three Summit League Championships (2009, 2010, and 2012), four Horizon League Championships (2014, 2015, 2021, and 2023) , and four NCAA Tournament Appearances (2010, 2014, 2015, and 2021).

46.    OUMS was ranked in the Top 25 of NCAA Division I national men's soccer teams six times (2009, 2010, 2012, 2014, 2015, and 2021) with Coach Pogue at the helm.

47.    Coach Pogue also won several individual accolades while leading OUMS to success.

48.    Coach Pogue was selected as the Summit League Coach of the Year twice (2009 and 2012).

49.    When OU joined the Horizon League, Coach Pogue was selected as *Coach of the Year* four times (2014, 2015, 2021, and 2023).

50.    Coach Pogue was even selected as the College Soccer News & College Sports Madness Horizon League Coach of the Year twice (2014 & 2015).

51.    At least three goalkeepers who played under Coach Pogue's tutelage now play in the MLS.

**D. OU Terminated Coach Pogue's Contract/Employment Because of his Disability and/or Speaking Out About Mental Illness in Men's Athletics.**

52.    OU had an established pattern or practice of renewing Coach Pogue's employment contract or automatically offering a new one to keep Coach Pogue as the OUMS Head Coach.

53.    Coach Pogue was most recently under contract with OU to be the OUMS Head Coach until December 31, 2025.

54.    Coach Pogue had every intention of remaining with OUMS as their Head Coach until the age of retirement.

55.    However, unfortunately, in December 2021, Coach Pogue suffered a significant personal loss – the passing of his mother – that caused him to suffer from a serious bout of depression.

56.    Before her passing, Coach Pogue was his mother's caregiver and lived with her to better care for her.

57.    Her loss had a tremendous impact on Coach Pogue, and he was later diagnosed with depression and anxiety.

58.     Despite the diagnosis, Coach Pogue did not compromise his coaching, availability to his players, or the team's overall success.

59.     Coach Pogue advised Defendants about his mental health struggles, and suggestions to cope with his struggles, but Defendants showed little interest in providing any support.

60.     Instead, Defendants began to treat Coach Pogue differently.

61.     Coach Pogue sought to bring awareness and combat the stigma surrounding men seeking mental health treatment, especially in athletics, and to increase the level of understanding regarding the illness that plagues different sectors of society today.

62.     When the opportunity came to address OU athletes, Coach Pogue wanted to speak about mental health issues – Defendants did not allow him to speak on it.

63.     What's more, despite Coach Pogue's ability to perform the essential functions of the job, and Defendants' knowledge of his illness, Defendants failed to engage in any interactive dialogue to reasonably accommodate Coach Pogue's disability.

64.     Instead, Defendants not only began placing more work restrictions – including those that other employees were not required to follow – but also began pressuring Coach Pogue to resign.

65. Defendant Stone even told Coach Pogue to "*do what's best for the athletes and resign*."

66. By the spring of 2023, with regards to his depression, Coach Pogue was at his lowest.

67. While Defendants were aware that the option to take leave was available to Coach Pogue, they failed to advise him of this option, and it was only after he sought medical treatment that he learned he can take leave to address his disability.

68. Coach Pogue then advised OU of his intention to take a leave of absence due to his depression and anxiety.

69. In response to a request for a written statement about his leave from OU for the public, Coach Pogue addressed his mental health struggles. **Exh. B** – Draft Leave Statement.

70. Defendants rejected Coach Pogue's draft written statement to prevent him from discussing his mental health, using the excuse that it was an alleged HIPAA violation – although it is Plaintiff that is to be protected from disclosure under HIPAA, and he had already given consent to disclosure the condition.

71. The statement that was eventually put out did not mention Coach Pogue's mental health at all. **Exh. C** – Pogue Leave Statement.

72.     Meanwhile, when the head coach for the OU Women's Basketball Team took leave, Defendants allowed a statement citing the coach's specific medical condition and treatment plan.  **Exh. D** – Comparator Leave Statement.

73.     In June 2023, Coach Pogue took leave to treat his depression.

74.     Coach Pogue was away on leave when the 2023 season began for OUMS.

75.     The OUMS team struggled in Coach Pogue's absence, winning only two of their first nine games.

76.     After Coach Pogue's return, the team won six of their next ten games, and won the 2023 Horizon League Championship.

77.     OUMS won seven league championships during Coach Pogue's 15-years as Head Coach.

78.     On or around November 3, 2023, Coach Pogue was awarded the 2023 Horizon League Coach of the Year Award, the fifth time he won the award as the OU head coach.

79.     Not only that but Coach Pogue continued to produce outstanding student-athletes in the classroom.

80.     Still, Defendants told him that they were not allegedly satisfied with his performance – despite him being the winningest coach for the university and free

from the usual reasons that cause a coach to be fired, including any scandal or simply not winning.

81.     Instead, not wanting to deal with Coach Pogue's mental challenges and have his condition associated with the University's athletic program, Defendants orchestrated a campaign to have Coach Pogue terminated by placing unnecessary work restrictions – not even mandated in his contract – and demands on him to set him up for failure.

82.     For example, in one instance, during the Fall of 2023, Defendant Stone required Coach Pogue to maintain a minimum of 15 hours of in-office time every week – knowing that he works often offsite for recruiting purposes and exercising the same routine that caused him to recruit student-athletes nationally and internationally that have produced winning teams and scholastic success.

83.     No other coach at OU had this arbitrary office-hour requirement.

84.     Nor did these 15 hours of in-office time advance OUMS' interests.

85.     For example, it limited the time Coach Pogue had to scout and recruit future players and reduced his productivity.

86.     Defendant Stone knew Coach Pogue was suffering from depression which affected him daily and was in the process of recovering.

87.     As the Head Coach of a soccer team, Coach Pogue's ability to adequately do his job did not rest on how much time he spent in an office – instead,

it was on winning, recruiting, following up on and producing successful student-athletes with good character and grades to be contributing members in society.

88.    Defendant Stone's requirement that Coach Pogue maintain 15 hours of in-office time was arbitrary, and her refusal to acknowledge his success on and off the field was intentional, malicious, and was because of Coach Pogue's disability.

89.    By all objective measures, Coach Pogue was leading an immensely successful OUMS team, both on and off the field.

90.    On or around February 6, 2024, Defendants terminated Coach Pogue's employment and/or contract.

91.    Defendants issued a menial statement about Coach Pogue's 15-year historic career, with the entirety of its announcement including six sentences.  **Exh. E** – OU Announcement.

92.    On the other hand, when the woman's soccer coach of only 7 years retired in 2023, Defendants issued a glowing, eight-paragraph statement about his accomplishments.  **Exh. F** – OU Comparator Announcement.

93.    Despite the success of the team in 2023, Coach Pogue's selection as the best coach in the Horizon League in 2023, and Coach Pogue's incredible accomplishments in 15 years as the Head Coach of OUMS, OU terminated Coach Pogue's employment and/or contract prematurely – because of his disability and/or protected speech and conduct.

94.     Defendants, through their employees, agents, and/or representatives, used their bias against Coach Pogue's to terminate him.

95.     Upon information and belief, Defendant OU did not discipline in any way the employee, agent, or representative – Defendant Stone and possibly others – responsible for discriminating against Coach Pogue based on his disability and terminating his employment.

96.     In other words, Defendant OU sanctioned, approved, and/or consented to the termination of Coach Pogue as a result of the discriminatory views of its employees, agents, and/or representatives, including Defendant Stone.

## COUNT I

### DISCRIMINATION BASED ON DISABILITY
### IN VIOLATION OF TITLE I OF THE ADA
### AGAINST DEFENDANT OAKLAND

97.     Plaintiff hereby re-alleges and incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

98.     The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42. U.S.C. § 12112(a).

99.    Plaintiff is a "qualified individual with a disability" as defined in 42 U.S.C. § 12131(2).

100.   Plaintiff is otherwise qualified for his position, with or without reasonable accommodation.

101.   Plaintiff's employer, Defendant Oakland, knew or had reason to know about his disability or perceived disability.

102.   Plaintiff has a disability that substantially limits a major life activity but, with or without accommodation, do not prevent him from performing the duties of a particular job.

103.   Defendant has, by reason of the disability or perceived disability of a qualified individual, excluded such individual – Plaintiff – from participation in, and denied him the benefits of, Defendant's employment, services, programs, and activities, and further subjected such individual to discrimination in violation of ADA by any or all of the following:

a.  Denying such qualified individual the opportunity to participate in or benefit from aids, benefits, or services;

b.  Affording such qualified individual with a disability an unequal opportunity to benefit from the aids, benefits, and services that are provided to others;

    c. Providing such qualified individuals with disability with aids, benefits, and services that did not afford him an equal opportunity to obtain the same result, gain the same benefit, or reach the same level of achievement as that provided to others;

    d. Utilizing criteria or methods of administration, including insufficient and inconsistent policies, practices, and procedures, that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; and

    e. Failing to make reasonable modifications in Defendant's policies, practices, or procedures to avoid discrimination on the basis of disability.

104. Defendant Oakland violated Title I of the ADA by discriminating against Plaintiff in a number of ways, including, without limiting, the following:

    a. Treating Plaintiff differently than other employees who did not have a disability;

    b. Treating Plaintiff differently than other employees who did have a disability; and/or

    c. Terminating Plaintiff and/or ending Plaintiff's employment due to his disability.

105.   Defendant Oakland acted intentionally and with deliberate indifference and knew or should have known of the deprivation of rights made to other employees in accordance with Defendant's policies and procedures but were not made available to Plaintiff because of his disability.

106.   Defendants also perceived Plaintiff's illness to be a disability.

107.   Defendants mistakenly believed that Plaintiff has an impairment that substantially limits one or more major life activities and/or mistakenly believed that an actual, non-limiting impairment substantially limits one or more major life activities.

108.   Defendants ascribed to Plaintiff an inability to perform the functions of the job because of a medical condition when, in fact, Plaintiff is perfectly able to meet the job's duties.

109.   As a result of Defendant's discrimination, Plaintiff suffered devastating compensatory damages and injuries, including but not limited to, severe humiliation, embarrassment, shame, sleepless nights, frustration, physical, mental and emotional distress, aggravated symptoms of mental illness, mental distress, depression, loss of income, loss of career, loss of goodwill, and other economic and noneconomic losses.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter a judgment in his favor and against Defendant and to prohibit or enjoin

Defendant from continuing to discriminate against persons with mental disabilities, in addition to any allowed compensatory damages, plus costs, and attorney fees, and grant such further and additional relief as this Court deems just and equitable.

## COUNT II

**FAILURE TO ACCOMMODATE**
**IN VIOLATION OF TITLE I OF THE ADA**
**AGAINST DEFENDANT OAKLAND**

110.   Plaintiff hereby re-alleges and incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

111.   Plaintiff has a disability as defined by the ADA.

112.   Plaintiff is a qualified individual as defined by the ADA.

113.   Defendant was aware of Plaintiff's disability or perceived him to have a disability.

114.   Defendant had full knowledge of Plaintiff's efforts to seek treatment for his mental illness.

115.   Plaintiff did not know what to do in treating his disability and sought help and guidance.

116.   In response, Defendant showed no interest, exerted little effort, and/or simply failed to accommodate or deal with Plaintiff's disabling condition.

117.   In fact, Defendant even retaliated against Plaintiff by placing additional work restrictions – such as mandatory hours physically in the office – that were not imposed on other coaches.

118.   Defendant's further actions include attempting to hide Plaintiff's mental illness – despite Plaintiff's request that it would be disclosed to increase public awareness of this disabling condition – causing further mental distress for Plaintiff.

119.   Plaintiff is otherwise qualified for his position, with or without reasonable accommodation.

120.   Plaintiff has a disability that substantially limited a major life activity but, with or without accommodation, do not prevent him from performing the duties of his job.

121.   Plaintiff repeatedly reached out and informed Defendant of his disabling condition.

122.   Defendant did not accept Plaintiff's disability well and failed to engage with Plaintiff to reasonably accommodate his disability.

123.   Defendants also perceived Plaintiff's illness to be a disability.

124.   Defendant Oakland violated Title I of the ADA by discriminating against Plaintiff in a number of ways, including but not limited to, adverse actions mentioned above and terminating his employment.

125.   As a result of Defendant's failure to accommodate, Plaintiff suffered devastating compensatory damages and injuries, including but not limited to, severe humiliation, embarrassment, shame, sleepless nights, frustration, physical, mental and emotional distress, aggravated symptoms of mental illness, mental distress, depression, loss of income, loss of career, loss of goodwill, and other economic and noneconomic losses.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter a judgment in his favor and against Defendant and to prohibit or enjoin Defendant from continuing to discriminate against persons with mental disabilities, in addition to any allowed compensatory damages, plus costs, and attorney fees, and grant such further and additional relief as this Court deems just and equitable.

## COUNT III

### DISCRIMINATION BASED ON DISABILITY
### IN VIOLATION OF THE REHABILITATION ACT
### AGAINST DEFENDANT OAKLAND

126.   Plaintiff hereby re-alleges and incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

127.   Plaintiff is an individual with a disability as defined in 29 U.S.C. § 705 *et. seq*.

128.   Plaintiff is a "qualified" individual with a disability.

129.   At all relevant times, Defendant received federal funds.

21

130. Plaintiff was excluded from participation in, denied the benefits of, and subjected to discrimination by Defendant on the basis of his disability.

131. Defendant Oakland engaged in prohibited actions by affording Plaintiff an opportunity to participate in or benefit from an aid, benefit, or service that is not equal to that afforded to others; by providing different aid, benefits, or services to Plaintiff that are not as effective as those provided to others; and by using criteria and/or methods of administration that have the effect of subjecting qualified persons with disabilities to discrimination on the basis of disability.

132. Plaintiff, on the basis of his disability, was excluded from participation in, denied the benefits of, and subjected to discrimination under a recipient's employment practices.

133. Defendants also perceived Plaintiff's illness to be a disability.

134. The decision to terminate Plaintiff employment was undertaken contrary to prior protocol, published criteria, and in the context of clear hostility to Plaintiff's disability.

135. Defendant Oakland violated the Rehabilitation Act by discriminating against Plaintiff in a number of ways, including, without limiting, the following:

  a. Treating Plaintiff differently than other employees who did not have a disability;

    b.   Treating Plaintiff differently than employees who did have a disability; and/or

    c.   Terminating Plaintiff and/or ending Plaintiff's employment due to his disability.

136.   As a result of Defendant's discrimination, Plaintiff suffered devastating compensatory damages and injuries, including but not limited to, severe humiliation, embarrassment, shame, sleepless nights, frustration, physical, mental and emotional distress, aggravated symptoms of mental illness, mental distress, depression, loss of income, loss of career, loss of goodwill, and other economic and noneconomic losses.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter a judgment in his favor and against Defendant to fully compensate him for any and all of his economic and non-economic damages, and to award costs, and attorney fees, and grant such further and additional relief as this Court deems just and equitable.

## <u>COUNT IV</u>

### FIRST AMENDMENT RETALIATION
### 42 U.S.C. § 1983: U.S. CONST. AMEND. I
### AGAINST BOTH DEFENDANTS

137.   Plaintiff hereby re-alleges and incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

138.    The First Amendment of the United States Constitution provides for Plaintiff's right to the freedom of speech.

139.    The right is enforceable against Defendants through the 14th Amendment of the United States Constitution.

140.    Congress created a cause of action for a violation of these rights under 42 U.S.C. § 1983.

141.    Plaintiff engaged in protected activity under the First Amendment of the United States Constitution by speaking out about his mental illness, mental illness in athletics, mental illness affecting coaches that are also under extreme pressure, and mental illness in general, including in his public leave of absence statement and before an assembly of student-athletes.

142.    This protected activity regarded matters of public concern.

143.    Defendants' actions against Plaintiff, through its employees, agents, and/or representatives, were motivated in significant part by Plaintiff's constitutionally protected speech.

144.    Plaintiff suffered an objectively adverse employment action when he was terminated on or around February 6, 2024.

145.    But for Plaintiff's exercise of his constitutionally protected right to free speech, he would not have been terminated.

146. Defendants' employees', agents', and/or representatives' actions violated Plaintiff's clearly established constitutional right to be free of retaliation for speech under the First Amendment to the U.S. Constitution and are not entitled to qualified immunity.

147. These actions were undertaken via a policy, practice, and/or procedure of Defendants.

148. As a result of Defendants' actions, Plaintiff suffered devastating compensatory damages and injuries, including but not limited to, severe humiliation, embarrassment, shame, sleepless nights, frustration, physical, mental and emotional distress, aggravated symptoms of mental illness, mental distress, depression, loss of income, loss of career, loss of goodwill, and other economic and noneconomic losses.

149. Defendants' actions were done intentionally and/or with reckless disregard to Plaintiff's federally-protected rights, entitling him to punitive damages.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter a judgment in his favor and against Defendants to fully compensate him for any and all of his economic and non-economic damages, and to award costs, and attorney fees, and grant such further and additional relief as this Court deems just and equitable.

## COUNT V

### DISCRIMINATION BASED ON DISABILITY
### IN VIOLATION OF THE MICHIGAN'S PERSONS
### WITH DISABILITIES CIVIL RIGHTS ACT
### AGAINST DEFENDANT OAKLAND

150.   Plaintiff hereby re-alleges and incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

151.   Plaintiff has a disability that substantially limited a major life activity but, with or without accommodation, do not prevent him from performing the duties of a particular job.

152.   Defendant has, by reason of the disability of a qualified individual, excluded such individual from participation in, and denied him the benefits of, Hurley's services, programs, and activities, and further subjected such individual to discrimination in violation of MCL 37.1201 *et. seq.* by:

    a.   Denying such qualified individual the opportunity to participate in or benefit from aids, benefits, or services;

    b.   Affording such qualified individual with a disability an unequal opportunity to benefit from the aids, benefits, and services that are provided to others;

    c.   Providing such qualified individuals with disability with aids, benefits, and services that did not afford him an equal opportunity to obtain the

same result, gain the same benefit, or reach the same level of achievement as that provided to others;

d. Utilizing criteria or methods of administration, including insufficient and inconsistent policies, practices, and procedures, that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; and

e. Failing to make reasonable modifications in Defendant's policies, practices, or procedures to avoid discrimination on the basis of disability.

153. Defendant Oakland violated MCL 37.1201 *et. seq.* by discriminating against Plaintiff in a number of ways, including, without limiting, the following:

a. Treating Plaintiff differently than other employees who did not have a disability;

b. Treating Plaintiff differently than other employees who did have a disability; and/or

c. Terminating Plaintiff and/or ending Plaintiff's employment due to his disability.

154. Defendant Oakland acted intentionally and with deliberate indifference and knew or should have known of the deprivation of rights made to other employees

in accordance with Defendant's policies and procedures but were not made available to Plaintiff because of his disability.

155.   As a result of Defendant's actions, Plaintiff suffered devastating compensatory damages and injuries, including but not limited to, severe humiliation, embarrassment, shame, sleepless nights, frustration, physical, mental and emotional distress, aggravated symptoms of mental illness, mental distress, depression, loss of income, loss of career, loss of goodwill, and other economic and noneconomic losses.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter a judgment in his favor and against Defendant and to prohibit or enjoin Defendant from continuing to discriminate against persons with mental disabilities, in addition to any allowed compensatory damages, plus costs, and attorney fees, and grant such further and additional relief as this Court deems just and equitable.

## COUNT VI

### FAILURE TO ACCOMMODATE
### IN VIOLATION OF THE MICHIGAN'S PERSONS
### WITH DISABILITIES CIVIL RIGHTS ACT
### AGAINST DEFENDANT OAKLAND

156.   Plaintiff hereby re-alleges and incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

157.   Plaintiff has a disability as defined by the PWDCRA.

158.   Plaintiff is a qualified individual as defined by the PWDCRA.

159.   Defendant was aware of Plaintiff's disability or perceived him to have a disability.

160.   Defendant had knowledge of Plaintiff's efforts to seek help for treatment of his mental illness.

161.   Defendant had knowledge of Plaintiff's efforts in seeking help to treat his mental illness.

162.   Plaintiff did not know what to do in treating his disability and sought help and guidance.

163.   In response, Defendant showed no interest, exerted little effort, and/or simply failed to accommodate or deal with Plaintiff's disabling condition.

164.   In fact, Defendant even retaliated against Plaintiff by placing additional work restrictions – such as mandatory hours physically in the office – that were not imposed on other coaches.

165.   Plaintiff is otherwise qualified for his position, with or without reasonable accommodation.

166.   Plaintiff has a disability that substantially limited a major life activity but, with or without accommodation, do not prevent him from performing the duties of his job.

167.   Plaintiff sought assistance from Defendant to treat and accommodate his disabling condition.

168. Defendant failed to provide the necessary assistance and accommodation.

169. Defendant has, by reason of the disability or the perceived disability of a qualified individual, excluded such individual from participation in, and denied him the benefits of, Defendant's employment, services, programs, and activities, and further subjected such individual to discrimination in violation of the PWDCRA by failing to make reasonable modifications in Defendant's policies, practices, or procedures to avoid discrimination on the basis of disability.

170. As a result of Defendant's actions, Plaintiff suffered devastating compensatory damages and injuries, including but not limited to, severe humiliation, embarrassment, shame, sleepless nights, frustration, physical, mental and emotional distress, aggravated symptoms of mental illness, mental distress, depression, loss of income, loss of career, loss of goodwill, and other economic and noneconomic losses.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter a judgment in his favor and against Defendant and to prohibit or enjoin Defendant from continuing to discriminate against persons with mental disabilities, in addition to any allowed compensatory damages, plus costs, and attorney fees, and grant such further and additional relief as this Court deems just and equitable.

## **COUNT VII**

### **BREACH OF CONTRACT**
### **AGAINST DEFENDANT OAKLAND**

171.   Plaintiff hereby re-alleges and incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

172.   Plaintiff and Defendant OU entered into an employment contract with expectations of renewals based on past conduct and/or practice.

173.   Defendant OU had the duty to allow Plaintiff to: practice his profession, pay Plaintiff compensation, manage OUMS' affairs, pay Plaintiff bonuses based on his performance, and remain in compliance with federal and state laws, among other things.

174.   Defendant OU breached its duties by preventing or inhibiting Plaintiff's ability to practice his profession, impeding Plaintiff's abilities to manage OUMS' affairs, pay Plaintiff bonuses based on his performance, failing to comply with federal and state laws including, but not limited to, anti-discrimination laws, and terminating or refusing to renew Plaintiff contract because of illegal reasons, among other things.

175.   As a proximate result of Defendant OU's breach of the contract, Plaintiff has been damaged, and will continue to suffer damages, in an amount in excess of $75,000.00 excluding costs, interest, and attorney fees.

**WHEREFORE**, Plaintiff respectfully requests this Honorable Court to enter a judgment against Defendant OU in the amount consistent with the damages sustained, plus interest, costs, and attorneys' fees wrongfully incurred to bring this action as provided under the law, in addition to any other damages, plus any relief the court deems just and equitable.

Respectfully submitted,

**AKEEL & VALENTINE, PLC**

By: /s/: SHEREEF H. AKEEL
     Shereef H. Akeel (P54345)
     Hasan Kaakarli (P81099)
     Daniel W. Cermak (84660)
     Attorneys for Plaintiff
     888 W. Big Beaver Rd., Ste. 350
     Troy, MI  48084
     (248) 269-9595
     shereef@akeelvalentine.com
     hasan@akeelvalentine.com
     daniel@akeelvalentine.com

DATED: April 29, 2024

## <u>JURY DEMAND</u>

**NOW COMES** Plaintiff, ERIC POGUE, by and through his undersigned counsel, AKEEL & VALENTINE, PLC, and hereby demands a Trial by Jury for the above-referenced cause of action.

Respectfully submitted,

**AKEEL & VALENTINE, PLC**

By: <u>/s/: SHEREEF H. AKEEL</u>
Shereef H. Akeel (P54345)
Hasan Kaakarli (P81099)
Daniel W. Cermak (84660)
Attorneys for Plaintiff
888 W. Big Beaver Rd., Ste. 350
Troy, MI  48084
(248) 269-9595
shereef@akeelvalentine.com
hasan@akeelvalentine.com
daniel@akeelvalentine.com

DATED: April 29, 2024